# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### *Northern Division*

|  |  |  |
|---|---|---|
| TRUSTEES OF THE IRONWORKERS LOCAL UNION NO. 16 PENSION PLAN, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Case No.: DLB-18-3681 |
| BRYANT CONCRETE CONSTRUCTION, INC., | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Defendant Bryant Concrete Construction, Inc. ("Bryant Concrete") provides goods and services as "an iron contractor or subcontractor in the construction industry." Compl. ¶ 6, ECF No. 1; Ans. ¶ 6, ECF No. 4; Bryant Aff. ¶ 1, ECF No. 24-2. While working as a subcontractor on a project for which its role "was to purchase and install reinforcing steel," Bryant Aff. ¶ 2, Bryant Concrete approached Plaintiff Local Union No. 5 of The International Association of Bridge, Structural and Ornamental Iron Workers (the "Union" or "Local 5") to obtain "enough manpower [to complete its] contractual obligations" and "skilled personnel to do that scope of work," Bryant Dep. 11:1–12:9, App'x 342–43, ECF No. 21-2. Bryant Concrete entered into a collective bargaining agreement ("CBA" or "Agreement") with the Union; the Agreement obligated it to pay contributions, including Union dues, at set hourly rates to the Union and seven funds who also are Plaintiffs in this action ("Funds").[1] Compl. ¶¶ 10, 12–13; Ans. ¶¶ 10, 12–13. Bryant Concrete did not, however, pay the

---

[1] The Funds include four whose trustees filed suit on their behalf: the Ironworkers Local Union No. 16 Pension Plan, the Ironworkers Local Union No. 16 Health Fund, the Ironworkers Local No. 5 Apprentice Fund, the Ironworkers Local No. 16 Vacation Fund (collectively, "Local 16 Funds"); the Ironworkers Industry Advancement Fund and the Ironworker-Management Progressive Action

Union and the Funds the contributions they expected, and Plaintiffs filed suit to recover the unpaid contributions, liquidated damages, interests, costs and attorneys' fees. Compl. 7–8.

Pending is Plaintiffs' Motion for Summary Judgment, in which they seek an entry of judgment in their favor in the amount of $159,655.19. ECF No. 21. The parties fully briefed the motion. ECF Nos. 21-1, 24, 24-1, 25. Because the Union must arbitrate its disputes before bringing them in this Court, the motion is denied as to the Union. With regard to the Funds' claims, no genuine dispute exists regarding the amount of unpaid contributions due and Defendant's obligation to pay them. Additionally, no genuine dispute exists regarding liquidated damages, interest, attorneys' fees, or costs, and an award of attorneys' fees and costs is not premature. Therefore, the motion is granted as to the Funds.

## Background[2]

The Local 16 Funds and the Annuity Fund "are multiemployer benefit plans organized under the provisions of [ERISA]"; the Industry Funds are trust funds that "provide benefits to employers and employees in the unionized iron working industry." Cole Decl. ¶¶ 5–6, App'x 2; Brown Decl. ¶¶ 3–4, App'x 208–09. A multiemployer pension plan enables multiple employers that work within the same industry to

> "pool contributions into a single [trust] fund that pays benefits to covered retirees who spent a certain amount of time working for one or more of the contributing employers." When an employer executes a CBA with a local union governing the terms of employment, the CBA will often require the employer to contribute to such a plan. Thus, in addition to signing on to a CBA with the union, an employer will also sign on to the terms and conditions of the plan's separate governing documents.

*Bd. of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*, 929 F.3d 135, 138 (4th Cir.

---

Cooperative Fund (together, "Industry Funds"); and the Mid-Atlantic States District Council Participating Locals Annuity Fund ("Annuity Fund"), whose trustees also filed suit on its behalf.

[2] The facts presented in this Background include undisputed facts from the parties' briefs and attachments. *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

2019) (quoting *Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Just Born II, Inc.*, 888 F.3d 696, 698 n.1 (4th Cir. 2018) (internal quotation marks omitted)). And, because plans "suffer[] financial setbacks when participating employers cease[] contributing to the plan," Congress enacted the Multiemployer Pension Plan Amendments Act of 1980 (the "MPPAA"), an amendment to ERISA, to "stabiliz[e] plans" and to "ensure benefit security to plan participants." *Id.* at 138–39 (citing H.R. Rep. No. 96-869(I), at 71 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 2918, 2939). Thus, even though "the plan is not a party to the CBA between the employer and union," pursuant to the MPPAA, a multiemployer plan, through its trustees, may file suit against an employer and collect contributions "so long as the plan is able to establish an obligation to contribute under the terms of the plan's governing documents or the CBA." *Id.* at 138, 1399 (citing 29 U.S.C. § 1145; *Laborers Health & Welfare Trust Fund for N. Cal. v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 547 (1988)).

Bryant Concrete is an employer subject to ERISA's provisions. Compl. ¶ 6; Ans. ¶ 6. It "entered into a collective bargaining agreement . . . with Local 5 on or about December 4, 2017," under which it agreed to pay the Funds "certain payments . . . for each hour worked by each of the employees covered by the Agreement and also agreed to deduct union dues and other amounts from its employees' wages and remit those amounts to Local 5." Compl. ¶¶ 10, 12–13; Ans. ¶¶ 10, 12–13. Employers pay these "contributions" to the Funds "on a monthly basis for each hour worked by their iron worker employees at a set hourly rate," and the contributions finance the Funds. Pls.' Mem. 1–2.

> The CBA that Bryant Concrete signed provided:
>
> B. The Employer, when signing this Agreement, shall become bound to all Trust Fund Agreements and provisions contained herein, the terms of which are incorporated herein, including interest and liquidated damages for failure to pay said Fringe Benefits when due. Failure of the Employer to pay the Fringe Benefits when due will be a breach of this Agreement, and the Union shall have the right to picket or strike until the Fringe Benefits have been paid.

C. The Employer agrees to make all Fringe Benefits and Payroll Deductions, which must be postmarked no later than the 15th day of the month following the month employees are employed. When failing to pay these amounts on time, the Employer agrees to pay, as referenced in paragraph B above, a rate of 10% Liquidated damages and 12% Interest per annum calculated on the total monthly contributions. This provision will be strictly enforced. . . .

CBA § 40(B)–(C), App'x 27, ECF No. 21-2. Additionally, the agreements governing the Local 16 Funds and the Annuity Fund, to which Bryant Concrete, through the CBA, agreed to be bound, "provide that in the event an employer becomes delinquent, the Fund may collect interest and liquidated damages assessed on the unpaid contributions, plus all reasonable expenses, including attorneys' fees and costs, incurred by the Funds in enforcing the payment of amounts due." Pls.' Mem. 4; *see* Pension Fund Agr. art. VI, § 6, App'x 90–91; Health Fund Agr. art. VI, § 6, App'x 124–25; Training Program Fund Agr. art. VI, § 6, App'x 157–58 (same); Annuity Fund Agr. art. VI, § 6, App'x 230–31; Vacation Fund Agr. art. VI, § 6, App'x 186–87.

Bryant Concrete's Union-member employees worked 4,168 hours in the months of December 2017 through March 2018, and the company filed remittance reports to that effect. Pls.' Mem. 5; Reports, App'x 200–07; Def.'s Opp'n Mem. 2. Three other employees, who were not Union members, worked a combined 269.5 hours "performing iron work" in December 2017, but their hours did not appear on the remittance reports. Pls.' Mem. 5; Pls.' Reply 3; Def.'s Opp'n Mem. 3; Bryant Dep. 35:3–15, App'x 347. Bryant Concrete made contributions to Plaintiffs totaling $1,662.00. Cole Decl. ¶ 18, App'x 5.

Plaintiffs, who believe Bryant Concrete owes them $23.59 for each hour worked by Union and non-Union employees alike, Pls.' Mem. 10, filed suit, seeking to recover unpaid contributions, liquidated damages, interest, costs and attorneys' fees, Compl. 7–8. Now pending is Plaintiffs' Motion for Summary Judgment, in which they argue that they

are entitled to the entry of summary judgment in the amount of $159,655.19, consisting of an award of the following damages against the Defendant: (1)

contributions in the amount of $103,018.63 owed for the period December 2017 through March 2018; (2) liquidated damages in the amount of $11,843.69 assessed on the unpaid contribution[s]; (3) interest in the amount of $17,979.95 assessed on the unpaid contributions; (4) attorneys' fees and costs in the amount of $[26,812.92]; and (5) an award of post-judgment interest at the statutory rate from the date of judgment to payment.

Pls.' Mem. 14; *see also id.* at 13 ($25,630.25 in attorneys' fees and $1,182.67 in costs). While Bryant Concrete concedes that it "intentionally withheld payment of fringe benefits to the union's workers," it nonetheless contends that summary judgment is not proper because disputes exist regarding the contributions rate (Bryant Concrete insists it is $18.89, not $23.59) and whether contributions are due for non-Union employees (in Bryant Concrete's view, they are not). Def.'s Opp'n Mem. 2–3. Moreover, as Bryant Concrete sees it, the Union "damaged Bryant Concrete by slowing productivity[,] . . . refusing to allow Bryant Concrete to hire laborers to work alongside union rodmen," and "refusing to allow Bryant Concrete to hire nonunion rodmen," and therefore the company does not owe Plaintiffs anything. Def.'s Opp'n Mem. 3, 5. And, Bryant Concrete argues that the dispute regarding its ability "to assert defenses should be referred to an arbitration panel following the procedures set forth in article 88 of the agreement between the parties." *Id.* at 7.

### Standard of Review

Summary judgment is appropriate when the moving party establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To meet its burden, the party must identify "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" in support of its position. Fed. R. Civ. P. 56(c)(1)(A). Then, "[t]o avoid summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue for trial." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The opposing party must

identify more than a "scintilla of evidence" in support of its position to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 251. Although "a court should not weigh the evidence," *Perkins*, 936 F.3d at 205 (quoting *Anderson*, 477 U.S. at 249), if "a party fails to establish the existence of an element essential to that party's case" or "'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party,'" then summary judgment is proper, *id.* (quoting *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23. In ruling on a motion for summary judgment, this Court "view[s] the facts and inferences drawn from the facts in the light most favorable to . . . the nonmoving party." *Perkins*, 936 F.3d at 205 (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996)).

## Discussion

### Arbitration

As a preliminary matter, I must determine whether the CBA obligates Plaintiffs to pursue arbitration before bringing their claims in this Court. Bryant Concrete insists that "[w]hether this collective bargaining agreement can be interpreted so as to bar the defendant employer's right to assert defenses should be referred to an arbitration panel following the procedures set forth in article 88 of the agreement between the parties." Def.'s Opp'n Mem. 7.[3] Plaintiffs counter that "there is no evidence that the parties intended to arbitrate disputes regarding contributions owed by Defendant," as "the language of the collective bargaining agreement shows that the arbitration provision only applies to disputes between the union and the employer." Pls.' Reply 9.

The Supreme Court has held that, to determine whether trustees of multiemployer trust funds are bound by an arbitration clause in a collective bargaining agreement between a union and an employer, the court must consider whether the parties intended "to require arbitration of disputes

---

[3] Although Bryant Concrete raises this defense, it has not filed either a motion to dismiss or a motion to compel arbitration.

between the trustees and the employers." *Schneider Moving & Storage Co. v. Robbins,* 466 U.S. 364, 371, 372 (1984). In *Maryland Elec. Indus. Health Fund v. MESCO, Inc.,* this Court relied on *Schneider* to conclude that the union appearing as a plaintiff before it was "bound by [the arbitration] requirements" in the applicable collective bargaining agreement, but the trustee plaintiffs were not. No. ELH-12-505, 2014 WL 853237, at *8–9 (D. Md. Feb. 28, 2014). The Court observed that the arbitration clause in the collective bargaining agreement "refer[red] in several instances to the obligations of 'the parties'" and other provisions of the agreement stated that "the Trustees shall have the right to take *whatever steps are necessary* to secure compliance" by an employer and "expressly state[d] that unpaid contributions 'may be recovered *by suit* initiated by the [fund]." *Id.* Considering these provisions, the Court found that "summary judgment for [the union was] unwarranted," whereas "there [was] no indication in the CBA that [the trustees were] permitted, much less required, to invoke the dispute resolution procedure." *Id.*

Here, the Agreement, which the Union and the employer but neither the Funds nor their trustees entered into, provides that "[a]ny dispute as to the proper interpretation of this Agreement shall be handled in the first instance by a representative *of the Union and the Employer*, and if they fail to reach a settlement within five (5) days, it shall be referred to a Board of Arbitration . . . ." CBA § 88(A), App'x 49. And, it states that "the decision of the Board of Arbitration shall be final and binding upon *both parties.*" *Id.* § 88(B), App'x 49. This arbitration clause establishes that *the parties,* that is, the Union and the employer, intended to be bound to arbitrate disputes about how to interpret the CBA, but it does not show any intent "to require arbitration of disputes between *the trustees* and the employers." *Schneider,* 466 U.S. at 372 (emphasis added).

Additionally, the CBA incorporates the terms of "all Trust Fund Agreements." CBA § 40(B). The Funds' agreements empower the Funds' trustees to "take *any action* which they may find necessary or desirable to collect Contributions due the Trust Fund" and to "*commence* or defend *any legal . . .*

*proceedings* brought in connection with the Trust Fund and represent the Trust Fund in all such proceedings." Pension Fund Agr. art. V, § 5(a)–(b), App'x 81 (emphases added); *see also* Health Fund Agr. art. V, § 5(a)–(b), App'x 113 (same); Training Program Fund Agr. art. V, § 5(a)–(b), App'x 148 (same); Annuity Fund Agr. art. V, § 4(a)–(b), App'x 222 (same); Vacation Fund Agr. art. V, § 4(a)–(b), App'x 180 (empowering Fund's trustees to "take *such steps* as may be deemed necessary or desirable to collect Contributions due the Trust Fund" and to "*commence* or defend *any legal . . . proceedings* brought in connection with the Vacation Trust Fund and represent the Vacation Trust Fund in all such proceedings"). Thus, by incorporating the terms of the Funds' agreements, the CBA expressly permits the Funds to proceed in court. In light of the CBA's arbitration clause and the relevant provisions of the Funds' agreements, the Funds' claims may proceed in this Court. *See Schneider*, 466 U.S. at 371–72; *Maryland Elec. Indus. Health Fund*, 2014 WL 853237, at *8–9.

The Union, however, first must arbitrate its claims. CBA § 88(A); *see Maryland Elec. Indus. Health Fund*, 2014 WL 853237, at *8. Plaintiffs insist that the claim before for the Court are outside the scope of the arbitration clause, *see* Pls.' Reply 9, which also provides that "[t]he Board of Arbitration shall have jurisdiction over all questions involving the interpretation and application of any section of this agreement" but "shall not, however, be empowered to handle negotiations of a new Agreement, changes in the wage scale or jurisdictional disputes," CBA § 88(C), App'x 49. But this litigation is not simply about "changes in the wage scale"; the parties dispute the applicable wage rate and the employees for whom contributions are due. Consequently, the Board of Arbitration has jurisdiction over the issues raised in the Union's claims, and the Union's motion for summary judgment is denied. *See* Fed. R. Civ. P. 56(a); *Maryland Elec. Indus. Health Fund*, 2014 WL 853237, at *8. I will consider the merits of the motion as to the Funds only.

### Contributions Rate

Pursuant to the CBA, the hourly contributions rate for work performed between April 1, 2015

and March 30, 2016 was $18.89. CBA ¶ 41(A)(1), App'x 30. The Agreement also provided that "[a]ll wage rates, fringe benefits and payroll deductions are subject to change upon yearly contract negotiations," and that "[a]ll changes will be sent in writing to all employers." CBA ¶ 41(A)(1), App'x 28.

Plaintiffs offer evidence that when Kyrone Bryant, president of Bryant Concrete, signed the CBA, he also received a notice about adjustments to the contributions rate for the relevant time period. Beckman Decl. ¶¶ 3–4, App'x 250–51; *see* App'x 60 (notice). The notice stated that, for worked performed between June 1, 2017 and May 31, 2018, the fringe benefits payments would be $20.66 per hour and the payroll deductions would be $2.93, bringing the hourly contributions rate to $23.59. App'x 60.[4]

Certainly, Mr. Bryant asserted in his affidavit that the CBA established fringe benefit payments "at the rate of $18.89 per hour . . . and no other rate of fringe benefits was agreed by the parties." Bryant Aff. ¶ 5; *see also id.* ¶ 4 (asserting that the CBA "was not amended after it was signed"). Yet, he attached "preprinted form[s]" that "the union prepared . . . for Bryant Concrete to fill out," which Mr.

---

[4] The notice listed the following fringe benefits:

    $9.70   PENSION
    $3.10   ANNUITY
    $6.83   HEALTH & WELFARE
    $0.85   APPRENTICESHIP & TRAINING
    $0.06   INDUSTRY ADVANCEMENT FUND
    $0.12   I.M.P.A.C.T.
    *$20.66   TOTAL FRINGES*

App'x 60. And it listed the following payroll deductions:

    $1.19   - WORKING DUES
    $0.50   - IRONWORKERS TARGET PROGRAM . . .
    $0.10   - IRONWORKERS ORGANIZING PROGRAM
    $0.01   - B.U.I.L.D. (VOLUNTARY)
    $1.00   - VACATION FUND . . .
    $0.13   - I.M.P.A.C.T.

*Id.*

Bryant had completed. Bryant Aff. ¶ 8 & Ex. 2, ECF No. 24-4. The forms included a report for the "Iron Workers Local No. 5 Combined Funds," i.e., the Local 16 Funds and the Industry Funds, which indicated that the total hourly rate for employer contributions to those funds was $20.49, ECF No. 24-4, at 2, and also reports for the Annuity Fund, which indicated that the hourly rate for employer contributions to the Annuity Fund was $3.10, ECF No. 24-4, at 4, 7, 10, 12; *see id.* at 5, 8, 11 (reports listing all Funds for a total of $23.59). Thus, there is no genuine dispute that Bryant Concrete had to make contributions to Plaintiffs totaling $23.59 per hour, and Mr. Bryant was aware of this requirement, having completed forms stating the applicable rates. *See* Bryant Aff. ¶ 8 & Ex. 2; App'x 60.[5]

## Hours for which Bryant Owes Contributions

As noted, the parties agree that Bryant Concrete's Union-member employees worked 4,168 hours in the months of December 2017 through March 2018, and the CBA obligated Bryant Concrete to pay contributions for those hours. Pls.' Mem. 5; Reports, App'x 200–07; Def.'s Opp'n Mem. 2–3. They also agree that three non-Union employees worked a combined 269.5 hours in December 2017. Pls.' Mem. 5; Pls.' Reply 3; Def.'s Opp'n Mem. 3; Bryant Dep. 35:3–15, App'x 347. But they disagree about whether the CBA obligated Bryant Concrete to pay contributions for hours worked by non-Union employees: In Bryant Concrete's view, contributions were not due for hours that the three non-Union employees worked, whereas Plaintiffs insists that contributions were due for all hours worked, regardless whether Union or non-Union employees were working, Pls.' Mem. 9–10; Def.'s Opp'n Mem. 2–3. According to Plaintiffs,

> The plain language of the collective bargaining agreement signed by Defendant requires Defendant to pay contributions on all hours worked by any of its employees performing iron work, regardless of whether each such employee is a member of Local 5. Specifically, the agreement expressly defines its coverage to the work performed,

---

[5] Because I am granting Plaintiffs' motion as to the Funds only, the Funds must supplement their motion to adjust their calculations to reflect an hourly that does not include payment to the Union.

rather than union membership. (App. 010 (CBA 1.A)). The agreement also states that contributions must be paid for each hour "for which each employee is paid." (App. 027 (CBA 40.a)). The Fourth Circuit Court of Appeals has determined that this language unambiguously requires a signatory contractor to pay benefit fund contributions for each hour worked by any employee, regardless of the employee's status as a member or nonmember of the union. <u>Clark v. Ryan</u>, 818 F.2d 1102, 1105 (4th Cir. 1987).

Pls.' Reply 3–4.

"[C]ollective bargaining agreements are not interpreted under traditional rules of contract but under a federal common law of labor policy." *Trustees of the Plumbers & Gasfitters Local 5 Ret., Sav. Fund v. Conditioned Air Sys., Inc.*, No. CCB-12-730, 2014 WL 1292105, at *9 (D. Md. Mar. 28, 2014) (quoting *Keffer v. H.K. Porter Co.,* 872 F.2d 60, 62 (4th Cir. 1989)). Thus, "to interpret such an agreement it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements." *Trull v. Dayco Prod., LLC*, 178 F. App'x 247, 250 (4th Cir. 2006) (quoting *Keffer*, 872 F.2d at 62). Beyond this consideration, however, application of federal law instead of state law often is a distinction without a difference, as "the principles of contract interpretation are the same" under Maryland and federal common law. *Bliss v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 132 F. Supp. 3d 676, 680 & n.2 (D. Md. 2015) (noting that, when interpreting an ERISA plan, "both state law and general contract law principles inform [the Court's] attempt to divine the meaning of an undefined term" (quoting *Johnson v. Am. United Life Ins. Co.,* 716 F.3d 813, 819 (4th Cir. 2013))); *see Int'l Ass'n of Heat & Frost Insulators & Allied Workers Local No. 24 v. Chesapeake Firestop Prod., Inc.*, No. TDC-16-1116, 2017 WL 1535108, at *4 (D. Md. Apr. 27, 2017) ("We interpret collective-bargaining agreements . . . according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy." (quoting *M&G Polymers USA, LLC v. Tackett,* 135 S. Ct. 926, 933 (2015)).

When, as here, the parties dispute the meaning of a contractual provision, the Court "look[s] to the entire language of the agreement, not merely a portion thereof" to discern the meaning and, "[i]f the contract is unambiguous, the court must give effect to its plain meaning." *OT, LLC v. Harford Cty., Maryland*, No. GLR-17-2812, 2019 WL 4598010, at *6 (D. Md. Sept. 23, 2019) (quoting *Sumanth v. Essential Brands, Inc.*, No. MJG-17-2450, 2018 WL 558612, at *3 (D. Md. Jan. 25, 2018)); *see also Plotnick v. Computer Scis. Corp. Deferred Comp. Plan for Key Executives*, 875 F.3d 160, 166 (4th Cir. 2017) (stating, in the context of ERISA plan interpretation, that the court "will enforce 'the plain language of [the contract] in accordance with its literal and natural meaning'" (quoting *Ret. Comm. of DAK Ams. LLC v. Brewer*, 867 F.3d 471, 480 (4th Cir. 2017))). If a reasonably prudent person could attribute more than one meaning to a provision, then the contract is ambiguous. *OT*, 2019 WL 4598010, at *6. And, a contractual ambiguity may give rise to a genuine dispute of material fact that precludes summary judgment. *See id.*

Of course, when extrinsic evidence on the record before the court on summary judgment is "dispositive of the interpretative issue," such that there is no genuine dispute, the court may resolve a contractual ambiguity on summary judgment. *Sprint Nextel Corp. v. Wireless Buybacks Holdings, LLC*, 938 F.3d 113, 131 (4th Cir. 2019) (quoting *Wash. Metro. Area Transit Auth. v. Potomac Inv. Props., Inc.*, 476 F.3d 231, 235 (4th Cir. 2007)). But, "[i]f . . . resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must . . . be refused and interpretation left to the trier of fact." *Id.* (quoting *Wash. Metro.*, 476 F.3d at 235); *see also W. C. English, Inc. v. Rummel, Klepper & Kahl, LLP*, 934 F.3d 398, 404–05 (4th Cir. 2019) (concluding that summary judgment was improper on the record before it because the parties disputed a contractual provision, the interpretation proposed by the party opposing summary judgment was "at the very least, reasonable," and, "while the district court was authorized to construe

unambiguous language as a matter of law, it could not resolve genuine disputes regarding the meaning of ambiguous contractual language against the nonmoving party on summary judgment").

Here, Plaintiffs rely on Section 1(A) and 40(A) in support of their position that the CBA unambiguously required contributions for all hours worked by Union and non-Union employees alike. Pls.' Mem. 10; Pls.' Reply 3–4. Section 1(A) of the CBA states:

> It is agreed that the jurisdiction of work covered by This Agreement is that provided for on the charter grant issued by the American Federation of Labor to the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers, it being understood that the claims are subject to trade agreements and final decision of the AFL-CIO.

CBA § 1(A). This paragraph sheds no light on whether Bryant Concrete must pay contributions for non-Union employees' hours spent on such work. But, the contract must be read as a whole. *See OT*, 2019 WL 4598010, at *6. The paragraphs that follow are elucidating, as they make clear that the Union members "claim" various classifications of work as "the work of the Iron Worker" and work that "shall be done by the Iron Workers," leaving no room for any hours spent on these types of work to be excluded from coverage (and contributions) under the CBA. *E.g.*, CBA §§ 6(A) ("*Members of this Union* shall be employed on *all work* in connection with reinforcing of concrete . . . ." (emphasis added)), 8(Q) (referring to "the work of the Iron Worker"), 9(B) "*All* industrial type furnaces shall be unloaded, handled and erected by Iron Workers." (emphasis added)), 9(D) (stating that work replacing and repairing rubber-lined tanks "shall be done by the Iron Workers"), App'x 16–17; *see also id.* §§ 3–28, App'x 11–22. Additionally, Paragraph 40, which specifically addresses "WAGES, FRINGE BENEFITS, PAYROLL DEDUCTIONS AND TRUST FUNDS," states: "The amount paid in Fringe Benefits and the amount withheld for payroll deductions shall be paid at straight time rate for each hour for which *each employee* is paid." *Id.* § 40(A) (emphasis added).

The CBA does not define "employee," but Plaintiffs insist that, under Fourth Circuit case law, "this language [referring to each employee] unambiguously requires a signatory contractor to pay

benefit fund contributions for each hour worked by any employee, regardless of the employee's status as a member or nonmember of the union." Pls.' Reply 3–4 (quoting *Clark v. Ryan*, 818 F.2d 1102, 1105 (4th Cir. 1987)). As noted, in interpreting collective bargaining agreements, it is helpful to consider how other agreements have been used in the industry. *See Trull*, 178 F. App'x at 250. In *Clark*, as here, trustees sought to collect contributions that an employer (Ryan) had failed to pay for non-union employees. 818 F.2d at 1104. The district court concluded that the collective bargaining agreement's language was ambiguous regarding Ryan's contribution requirements and, relying on extrinsic evidence in the form of Ryan's testimony, it concluded that the agreement "obligated [Ryan] to make contributions only on behalf of his union employees." *Id.*

On appeal, the Fourth Circuit reversed, concluding that the language of the agreement was unambiguous and "plainly require[d] employers to contribute to the three funds on behalf of all their employees, both union and non-union." *Id.* The court reasoned:

> The language of the relevant agreements repeatedly refers to the type of work performed, not to the status of union membership. The short form agreement provides that "the Employer agrees to make payments to the stated Plans covering all of its employees in the craft classification represented by and within the jurisdiction of Local Union No. 697." Similarly, the provisions of the master agreement relating to the pension and apprenticeship funds cover "employee[s] in the craft classification represented by Local 697." The craft classifications represented by and within Local 697's jurisdiction are listed in Article I of the agreement.

*Id.* at 1105. Here, also, the CBA defines its parameters by the scope of the work, such that "all" work within the listed classifications is covered, regardless who performed it, because it is designated as "the work of the Iron Worker." CBA §§ 3–28, App'x 11–22. Additionally, the CBA states that "hourly wage rates and fringe benefits will apply to the following classifications," without referring to Union-members or non-members. *Id.* § 41(A)(1).

In *Clark*, noting that the preamble "designate[d] Local 697 as the exclusive bargaining representative for 'all persons employed' by the contractors who fall within the craft classifications specified in Article I of the agreement," the Fourth Circuit concluded "that when the health and

welfare provision" elsewhere in the agreement referred only "to 'employees represented by Local 697,' it mean[t] all of Ryan's employees, both union members and non-members, who perform[ed] a particular type of work." *Id.* at 1104, 1105. The court noted that

> Other provisions of the agreement provide further support for this interpretation. For example, in Article I, section 3-A, the parties agreed that, for employer convenience, employers' fringe benefits reports may also serve as health and welfare fund reports "on the hours worked by all employees." In addition, the parties specifically refer to union "members" in other provisions of the agreement, such as the dues check off provision, where the distinction between union membership and union representation is relevant.

*Id.* Here, also, the contractual language shows the drafter's ability to distinguish between Union members and employees when necessary:

> The Employer will deduct from *each employee's* weekly gross wages a percentage negotiated by *all union members* and all elected union officials for the working assessment and check-off.
>
> The Employer will send by check, the amount withheld from employee's [sic] for Working Assessment and Check-Off . . . , together with a statement setting forth the name, social security number, amount withheld and hours paid of *each employee from which this deduction has been withheld.*
>
> . . .
>
> *The members of the Local Union #16* authorize the Employer to deduct from *each employee's* pay a negotiated amount per hour worked from *each employee's* regular paycheck. . . .
>
> This deduction is voluntary on the part of *each employee* and Employers will be furnished with appropriate authorization by *each employee* authorizing said deduction.

CBA §§ 47–48, App'x 35 (emphasis added). As in *Clark*, the contract unambiguously requires the employer to make contributions for certain classifications of work, and the term "each employee" refers to Union and non-Union employees alike. *See* 818 F.2d at 1104–05. Accordingly, contributions are due for hours that Bryant Concrete's three non-Union employees worked as well. *See id.*

### Reductions in Amount Owed

Bryant Concrete concedes that it "intentionally withheld payment of fringe benefits to the

union's workers," Def.'s Opp'n Mem. 2, but insists that it was justified in offsetting any amount owed under the CBA based on its affirmative defense that the Union breached the CBA, *id.* at 3. According to Bryant Concrete, "the Ironworkers Union damaged Bryant Concrete by slowing down productivity . . . , refusing to allow Bryant Concrete to hire laborers to work alongside union rodmen" and "refusing to allow Bryant Concrete to hire nonunion rodmen." Def.'s Opp'n Mem. 3. Bryant Concrete totals the damages it allegedly suffered as $75,463.66 from slowed productivity, $11,237.76 from not being allowed to hire laborers, and $1,227.50 from not being allowed to hire nonunion rodmen, for a total of $87,928.92. *Id.*

Yet, Kyrone Bryant, president of Bryant, admitted that the CBA obligated Bryant to pay the Funds and the Union, Bryant Dep. 49:17–50:5, App'x 361–62, and when asked whether there was "any language in the CBA that supports [Bryant's] position" that it "suffered damages and, therefore, those damages should be weighed against the amount that [it] owe[s]," Mr. Bryant said "No." Bryant Dep. 50:7–22, App'x 362.

Insofar as the Funds bring claims against the employer—the only remaining claims at issue in the pending summary judgment motion—their cause of action is "independent of the contract on which the duty to contribute is based." *Bd. of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*, 929 F.3d 135, 139 (4th Cir. 2019) (quoting *Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1021 (4th Cir. 1997) (internal quotation marks omitted)). And, unlike under common law contract principles, where the Funds' claims "would be subject to common law defenses—such as the parties' intent, fraud in the inducement, or mistake of fact," under 29 U.S.C. § 1145, "'a multiemployer plan can enforce, *as written*, the contribution requirements found in the controlling documents.'" *Four-C-Aire, Inc.*, 929 F.3d at 139 (quoting *Ralph's Grocery*, 118 F.3d at 1021). Most significantly, "an employer is not permitted to raise defenses that attempt to show that the union and the employer agreed to terms different from those set forth in the agreement. Nor is

an employer permitted to raise defenses that relate to claims the employer may have against the union[.]" *Id.* (quoting *Ralph's Grocery*, 118 F.3d at 1021); *see also Lewis v. Benedict Coal Corp.*, 361 U.S. 459, 470–71 (1960) ("[W]e hold that the parties to a collective bargaining agreement must express their meaning in unequivocal words before they can be said to have agreed that the union's breaches of its promises should give rise to a defense against the duty assumed by an employer to contribute to a welfare fund meeting the requirements of s 302(c)(5)."). Thus, when a collective bargaining agreement imposes a contractual obligation on an employer, "even if [the] employer could assert a valid common law defense, it must give way to the plain language of the CBA or governing plan documents." *Four-C-Aire, Inc.*, 929 F.3d at 140 & n.2; *see also Lewis*, 361 U.S. at 470–71. Accordingly, Bryant Concrete cannot assert a contractual defense against the Funds, and it cannot used damages that the Union allegedly caused to set off its obligations to the Funds under the CBA. *See Four-C-Aire, Inc.*, 929 F.3d at 140 & n.2; *see also Lewis*, 361 U.S. at 470–71 (concluding that the trustees could sue the employer for delinquent contributions notwithstanding the union's strike, which violated the collective bargaining agreement, because the employer's obligation to the fund was not expressly contingent on the union's performance of its obligations under the agreement, and the employer could not reduce its obligation based on damages from the strike). Therefore, Bryant Concrete owes the Funds contributions totaling $23.59 per hour (less the amount due to the Union per hour) for 4,168 hours that Bryant Concrete's Union-member employees worked, as well as 269.5 hours that three non-Union employees worked.

### Interest, Liquidated Damages, Costs, and Attorneys' Fees

ERISA provides that an "employer who fails to make contributions as required by [statute] is liable to the multiemployer fund" not only for the unpaid contributions, but also for "interest on the unpaid contributions, liquidated damages of up to twenty (20) percent of the amount of the unpaid contributions, and reasonable attorneys' fees and costs." *Int'l Painters & Allied Trades Indus. Pension Fund*

*v. Finch Indus. Coatings LLC*, No. 18-2333-ELH (JMC), 2019 WL 6044197, at *5 (D. Md. Nov. 15, 2019) (quoting *Int'l Painters & Allied Trades Indus. Pension Fund v. Sign Maint. Lighting & Elec., Inc.*, No. ELH-14-3214 (SAG), 2016 WL 447319, at *3 (D. Md. Feb. 5, 2016) (citing 29 U.S.C. § 1132(g)(2))). And, as noted, the agreements governing the Local 16 Funds and the Annuity Fund, to which Bryant Concrete, through the CBA, agreed to be bound, "provide that in the event an employer becomes delinquent, the Fund may collect interest and liquidated damages assessed on the unpaid contributions, plus all reasonable expenses, including attorneys' fees and costs, incurred by the Funds in enforcing the payment of amounts due." Pls.' Mem. 4; *see* Pension Fund Agr. art. VI, § 6, App'x 90–91; Health Fund Agr. art. VI, § 6, App'x 124–25; Training Program Fund Agr. art. VI, § 6, App'x 157–58 (same); Annuity Fund Agr. art. VI, § 6, App'x 230–31; Vacation Fund Agr. art. VI, § 6, App'x 186–87.

*Interest and Liquidated Damages*

"ERISA provides for the accrual of interest at the rate provided for within the multiemployer plan." *Int'l Painters*, 2019 WL 6044197, at *6 (citing 29 U.S.C. § 1132(g)(2)(B)). For multiemployer plans, ERISA also provides for liquidated damages in

> (C) an amount equal to the greater of—
>> (i) interest on the unpaid contributions, or
>> (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A).

29 U.S.C. § 1132(g)(2)(C).

Here, the agreements with the Pension Fund, the Health Fund, the Training Program Fund, and the Vacation Fund provide for interest at a rate of 12% per year and liquidated damages of 10% of all overdue contributions. Pension Fund Agr. art. VI, § 6, App'x 91; Health Fund Agr. art. VI, § 6, App'x 125; Training Program Fund Agr. art. VI, § 6, App'x 158; Vacation Fund Agr. art. VI, § 6, App'x 187. The Annuity Fund's agreement provides for "(1) liquidated damages for each monthly

report or payment due in the amount of twenty percent (20%) of the amount due, plus interest at the rate of twelve percent (12%) from the due date to the date of payment; or (2) double interest as provided in ERISA." Annuity Fund Agr. art. VI, § 6, App'x 231. Bryant Concrete contends that interest is inappropriate because genuine disputes exist as to the material facts. Def.'s Opp'n 8. I have concluded to the contrary, however, that the material facts are not in dispute. As for liquidated damages, Bryant Concrete insists that such awards simply substitute for calculated damages and should not be awarded when, as here, damages can be calculated. Def.'s Opp'n 8–9. This is incorrect, as ERISA expressly provides for liquidated damages to be paid to multiemployer funds, in addition to unpaid contributions. *See* 29 U.S.C. § 1132(g)(2)(C).

The Funds are entitled to interest at a rate of 12% per year, pursuant to their agreements, as well as liquidated damages in an amount equivalent to the greater of (a) the amount of interest or (b) 20% of the unpaid contributions for the Annuity Fund or 10% of the unpaid contributions for the other funds. *See* 29 U.S.C. § 1132(g)(2)(B)–(C). Plaintiffs shall submit a calculation of interest and liquidated damages based on the amount of unpaid contributions due to the Funds but not to the Union.

### Attorneys' Fees and Costs

Plaintiffs also seek "attorneys' fees and costs in the amount of $[26,812.92]." Pls.' Mem. 14; *see also id.* at 13 ($25,630.25 in attorneys' fees and $1,182.67 in costs). Bryant Concrete argues that attorneys' fees must be addressed in a separate, post-judgment hearing pursuant to Local Rule 109.2(a). Def.'s Opp'n 7. Local Rule 109.2(a) sets a deadline for seeking attorneys' fees, but it does not preclude a party from seeking attorneys' fees earlier in litigation. *See* Loc. R. 109.2(a). Indeed, this Court routinely awards attorneys' fees in ERISA actions when it enters a judgment on the plaintiff's motion. *E.g.*, *Trs. of Nat'l Automatic Sprinkler Indus. Welfare Fund v. 715 Fire Prot., LLC*, No. PX-18-2359, 2019 WL 1492806, at *5 (D. Md. Apr. 4, 2019); *Trs. of the Elec. Welfare Tr. Fund v. Tech. Serv. Grp., LLC.*, No.

GJH-14-3018, 2016 WL 5462800, at *7 (D. Md. Sept. 27, 2016). Moreover, when the Court enters a judgment in the plaintiff plan's favor for unpaid contributions, it also *must* award reasonable costs and attorneys' fees. *See* 29 U.S.C. § 1132(g)(2)(D). And, as noted, the Funds' agreements also provide for an award of attorney's fees and costs "incurred by the Fund in collecting or attempting to collect the unpaid contributions, interest or liquidated damages, including but not limited to fees and costs to bring a lawsuit to collect these amounts." *See* Pension Fund Agr. art. VI, § 6(d), App'x 91; *see also* Health Fund Agr. art. VI, § 6(d), App'x 125; Training Program Fund Agr. art. VI, § 6, App'x 158; Annuity Fund Agr. art. VI, § 6, App'x 231; Vacation Fund Agr. art. VI, § 6, App'x 187.

> "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983). This approach is commonly known as the "lodestar" method. *Grissom v. The Mills Corp.,* 549 F.3d 313, 320 (4th Cir. 2008). In assessing reasonableness, the Fourth Circuit has instructed district courts to consider certain factors, including:
>
>> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorney's fees awards in similar cases.

*Nat'l Elec. Benefit Fund v. 3W Elec. LLC,* No. PWG-16-1580, 2017 WL 1079954, at *5–6 (D. Md. Mar. 20, 2017) (quoting *Barber v. Kimbrell's, Inc.,* 577 F.2d 216, 226 n.28 (4th Cir. 1978)).

Here, four attorneys worked on the case, Rebecca Richardson, Francis Martorana, Diana Cohn, and Katelyn Davis. Richardson Decl. ¶¶ 1–4, App'x 315–16. Mr. Martorana has practiced in the field of labor and employment benefits law for more than thirty-five years, *id.* ¶ 2, and this Court's Guidelines state that an hourly rate of $300–475 would be reasonable for that amount of experience. *See* Rules and Guidelines for Determining Attorneys' Fees in Certain Cases ¶ 3(e), Loc. R. App'x B.

Ms. Richardson and Ms. Cohn each have more than five years of experience in the field, Richardson Decl. ¶¶ 1, 3, and the Guidelines state that an hourly rate of $165–300 would be reasonable, Guidelines ¶ 3(b). Ms. Davis graduated in 2018, such that a rate of $150–225 would be reasonable, Guidelines ¶ 3(a); she only worked 2.5 of the 96.75 hours billed, App'x 321, 326. All of the attorneys billed at an hourly rate of $231 until January 31, 2019, and $251 after that. Richardson Decl. ¶ 6, App'x 316, 319–26. These are reasonable hourly rates, given that, for the three attorneys who performed over 97% of the work, they fall within or below the range of hourly rates this Court has identified as reasonable. *See* Guidelines ¶ 3(b), (e).

Plaintiffs' counsel billed for 96.75 hours spent on this litigation. Richardson Decl. ¶ 7, App'x 316. I have reviewed Richardson's Declaration, Appx's 316–18, Plaintiffs' time records, App'x 319–26, and the docket in this case. The case did not involve novel or difficult issues, but it did include extensive discovery, including depositions, as well as settlement negotiations and motions practice. Ms. Richardson states that "[t]he amount of time expended is within the usual and customary time spent by an attorney on this type of case in investigating the Plaintiffs' claims, drafting and filing the Complaint, conducting discovery, engaging in Court-ordered mediation, and preparing the Motion for Summary Judgment." Richardson Decl. ¶ 8. Further, counsel had considerable experience in their field. Under these circumstances, the amount of time spent litigating this case is reasonable. The amounts sought, *see* Pls.' Mem. 13, like the contributions themselves, must be adjusted to reflect amounts due to the Funds but not to the Union.

Plaintiffs seek $1,182.67 in costs in their Memorandum. Pls.' Mem. 13. Ms. Richardson stated that "Plaintiffs also incurred legal costs of $400 for the filing fee, $85 for a private process server to serve Defendant, $68.54 in making copies of records made available by Defendant during discovery, and $629.13 for transcribing the deposition of Defendant's corporate representative," and she provided invoices for all but the filing fee. Richardson Decl. ¶ 10, App'x 317, 328–30. "Costs that

may be charged include 'those reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client, in the course of providing legal services.'" *Nat'l Elec. Benefit Fund*, 2017 WL 1079954, at *6 (quoting *Trs. of the Nat'l Automatic Sprinkler Indus. Welfare Fund v. Westland Fire Prot., Inc.,* No. DKC-12-1421, 2014 WL 824121, at *3 (D. Md. Feb. 28, 2014)). The costs Plaintiffs identified are reasonable, but the $1,182.67 total must be adjusted to encompass only the costs properly allocated to the Funds and not to the Union.

*Post-Judgment Interest*

Finally, Plaintiffs seek "an award of post-judgment interest at the statutory rate from the date of judgment to payment." Pls.' Mem. 14. 28 U.S.C. § 1961(a) provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." This "interest is "calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment." 28 U.S.C. § 1961(a). Accordingly, Plaintiffs shall receive post-judgment interest at the statutory rate from the date of judgment through the date of payment. *See id.*; *see also Trustees of Nat'l Automatic Sprinkler Indus. Welfare Fund v. 715 Fire Prot., LLC*, No. PX-18-2359, 2019 WL 1492806, at *4 (D. Md. Apr. 4, 2019).

## Conclusion

In sum, Plaintiffs' Motion for Summary Judgment, ECF No. 21, IS GRANTED as to the Funds' claims; and IS DENIED as to the Union's claim. I will enter judgment in the Funds' favor for unpaid contributions, liquidated damages, interest, attorneys' fees and costs. Because the calculations in Plaintiffs' briefs were based on amounts owed to the Funds and the Union, the Funds will supplement their motion by January 24, 2020 to adjust their calculations, consistent with this Memorandum Opinion, to reflect an hourly rate that does not include payment to the Union; unpaid

contributions, liquidated damages, and interest based on that rate; and costs and attorneys' fees based on the amount of Plaintiffs' counsel's costs and fees properly allocated to the Funds. Bryant Concrete may respond to the supplement by February 7, 2020. Plaintiffs also shall receive post-judgment interest at the statutory rate from the date of judgment through the date of payment.

     A separate order shall issue.


Date: <u>January 10, 2020</u>                                        /S/                
                                                 Deborah L. Boardman
                                                 United States Magistrate Judge

lyb